GAVIGAN et al. v. CRARY.

(Third Division.　Valdez.　February 11, 1905.)

No. 75.

1. PUBLIC LANDS—SOLDIER'S ADDITIONAL HOMESTEAD—ASSIGNMENT.

A soldier's additional homestead certificate may be sold and assigned by the soldier, and the assignee may enter land with it in Alaska.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 353.]

2. SAME—ADVERSE SUIT—PARTIES.

An adverse suit brought to determine the respective rights of a claimant under the law permitting soldier's additional homestead certificates to be located on the public land in Alaska, and those who deny his right by adverse proceeding, under section 10 of the act of Congress of May 14, 1898 (chapter 299, 30 Stat. 413 [U. S. Comp. St. 1901, p. 1469]), may be maintained in the district courts of Alaska; the practice and parties being controlled and regulated solely by the Code of Alaska.　Nome-Sinook Mining Co. v. Simpson, 1 Alaska, 578.

3. SAME—INTERVENTION—PARTIES.

Settlers upon public lands claimed under the laws permitting soldier's additional homestead certificates to be located in Alaska may intervene in an adverse suit brought to quiet title thereto, though they have not filed an adverse in the the land office proceedings.

4. SAME—LANDS SUBJECT TO ENTRY—MILITARY RESERVATION—SOLDIER'S ADDITIONAL HOMESTEAD.

Public lands lying within the limits of a reservation for military purposes are not subject to entry under the soldier's additional homestead laws.

[Ed. Note.—For cases in point, see vol. 41, Cent. Dig. Public Lands, § 44.]

5. SAME.

Where a tract of public land is actually set apart by an order of the War Department for military purposes, and government appropriations expended in fitting it for such use, and the military forces remain in possession thereof until its abandonment by a formal notice posted by the military forces, held, that it was a military reservation.

The Copper River Exploring Expedition was organized March 17, 1899, at Washington, D. C., pursuant to general order No. 51 issued from the War Department. Capt. W. R. Abercrombie was placed in command, and the third subdivision of the general orders provided that:

"(3) The commanding officer will select suitable locations at Valdez, Copper Center, the crossing of the Upper Copper, the crossing of the Tanana, the head of Forty Mile creek, and at such other points as in his judgment he may deem proper for military reservations, and will survey, lay out by metes and bounds, and declare such reservations, reporting his action hereunder to the Department for the approval of the Secretary of War."

In pursuance to this authority, about April, 1899, Capt. Abercrombie took possession of a tract of land one mile square at the east end of Valdez Bay as a cantonment for his troops, for use in storing government property under his charge, as a base for his operations in relieving the unexpected misfortunes falling on a large number of mining prospectors, and in extending his reconnoissance into the interior of Alaska, as contemplated in his general orders. The southeast corner of the tract so occupied by the government was marked by a government monument, on which was posted or painted a description by metes and bounds of the tract so claimed and occupied by the military forces. At what date these acts of marking out the reservation took place is not clearly shown by the evidence, except that it is definitely shown that, before the defendant attempted to locate his soldier's additional homestead certificate, the boundaries were so clearly established, at least on the side where the town of Valdez grew up, as to exclude the town site settlers from the reservation, and the line between the town and the reservation was then clearly marked, and was and is now known as "Reservation Avenue." In the commanding officer's report to the Secretary of War for the year 1899 this reservation is located on the official map, signed by Abercrombie as commanding officer and Lieut. Babcock

as topographical officer.   See Exhibit 8-a.   The following is
a somewhat enlarged copy of that portion of the map showing
the reservation and the adjoining town of Valdez:

The deposition of Capt. Abercrombie was taken in this
cause at Philadelphia, Pa., September 22, 1904, and on the
question of the actual location of this reservation he testified:

"I located a reservation a mile square in April, 1899, adjoining
which the town of Valdez was subsequently built. I am unable at
present to give metes and bounds from memory.   Shortly after the
survey was made in May, 1899, by Lieut. Walter C. Babcock, it was
forwarded to Assistant Secretary of War for his approval, and was
approved by him in a subsequent order by authority of D. G. Meikle-
john, Asst. Sec't of War, published in G. O. No. 51 (57) A. G. O. 1899,
and is now on record at the War Department.   At the time of loca-
tion the metes and bounds were posted on signboard at the crossing
of a small creek between the town of Valdez and the reservation,
and the lands were marked out by stakes in the ground and by a
line cut through the timber which divded the reservation from the
town."

In the spring of 1898, and prior to the reservation of the
tract by Capt. Abercrombie, small tracts of this land were oc-
cupied and claimed by A. Von Gunther, the Pacific Steam
Whaling Company, and Shepherd.   The rights of the defend-

ant, and, so far as the evidence shows, of all other scrip claimants, originated after the declaration of reservation in April, 1899.

On August 7, 1901, defendant, Crary, caused a tract of land containing 16.02 acres to be marked out within the exterior boundaries of the mile square so reserved by Abercrombie, and caused it to be platted as survey No. 337. Defendant claimed the said 16.02 acres as a soldier's additional homestead, as the assignee of the certificate of one Thomas Gardenhier, issued and assigned under the general laws of the United States relating to soldiers' additional homesteads. The survey No. 337 was approved by the commissioner of the general land office on February 9, 1904, and the field notes filed in the land office in accordance with land office rules. Defendant, Crary, had no improvements on the land, and was not in the actual occupation or use thereof on the 25th day of July, 1902, except in so far as his survey and claim thereto under the law relating to soldiers' additional homesteads constitued a use and occupation.

On July 25, 1902, Capt. Eugene Wilson, commanding the military forces at Ft. Liscum and on the reservation in question, caused a notice to be posted limiting the reservation to a small tract whereon the United States telegraph station, stables, and other cantonment buildings stood, and abandoning the greater part of the reservation theretofore claimed within the mile square. Up to that moment the military forces had maintained an actual-occupation on said tract, and had effectually prevented the encroachments of settlers thereon, although the prior rights of Von Gunther, the Pacific Steam Whaling Company, and Shepherd had been recognized, and they had been allowed to remain in possession of their respective tracts.

On notice that the military authorities had abandoned said tract, and on July 25, 1902, large numbers of the residents of the town of Valdez swarmed onto the land, and, following the

lines of the streets of Valdez extended, located the greater portion of the abandoned reservation, including Crary's claim, as a town site. On the evening of that day, between 7 and 11 o'clock, after some of the town-site claimants had entered on his claim and staked lots, and posted notices of their claims, Crary stretched a barbed wire along some portions of the boundaries of the land claimed by him. This wire fence was not maintained. The owners of live stock running at large on the open lands cut it, and the evidence does not disclose that it was such a fence as would protect the land from the encroachments of stock; it was no more than a mere notice of Crary's claim, and soon disappeared.

Thereafter, and in September, 1902, these town-site claimants, plaintiffs and interveners, built on their respective lots, and thereafter the tract was, and is now, occupied by their permanent homes. In pursuance to his claim, the defendant applied to enter said land as a soldier's additional homestead, and on March 7, 1904, caused public notice of his intention to apply for patent to be issued from the United States land office at Juneau, Alaska, and to be published in the "Prospector" at Valdez. This suit was begun by the four plaintiffs within 60 days thereafter, to quiet their alleged title thereto.

On December 14, 1904, a petition of J. Whitney and 28 other persons was filed, asking to intervene in said suit as being persons situated similarly with the plaintiffs, and, over the objection of defendant, they were permitted to do so. Being at issue, the cause was tried before the court without a jury.

Brown & Smith, for plaintiffs and interveners.

Goodell & Edwards and Ostrander & Donohoe, for defendant, Crary.

WICKERSHAM, District Judge. A preliminary objection to the jurisdiction of the court must be examined before the merits of the case can be considered. In addition, the court

must say what issues of law and fact are presented for its judgment by the pleadings and evidence in the case.

The defendant bases his right to the property in controversy on a soldier's additional homestead entry, made under an assigned certificate issued to one Thomas Gardenhier. The Supreme Court of the United States, in the case of Webster v. Luther, 163 U. S. 331, 16 Sup. Ct. 963, 41 L. Ed. 179, carefully examined the general laws then in force in relation to soldiers' additional homestead entries on the public lands, and expressly settled the rule that the certificate issued to the soldier or sailor for his additional claim may be sold and assigned by him, and that his assignee may locate the certificate on any of the public lands of the United States subject to homestead entry.

By the first section of "An act extending the homestead laws and providing for right of way for railroads in the District of Alaska, and for other purposes," approved May 14, 1898, it was provided:

"That the homestead land laws of the United States and the rights incident thereto, including the right to enter surveyed or unsurveyed lands under provisions of law relating to the acquisition of title through soldiers' additional homestead rights, are hereby extended to the District of Alaska, subject to such regulations as may be made by the Secretary of the Interior." Chapter 299, 30 Stat. 409 [U. S. Comp. St. 1901, p. 1412].

As the assignee of the soldier's additional homestead certificate issued to Gardenhier, the defendant initiated his entry of this land on August 7, 1901, and took such steps thereafter as were necessary to procure an official survey and its approval by the Land Department, whereupon, and on March 7, 1904, he made application to enter the land under said certificate and the laws applicable thereto.

Subsequent to the initiation of his entry, and prior to his application on March 7, 1904, Congress passed an act to amend section 1 of the act of May 14, 1898 (chapter 299, 30 Stat.

409 [U. S. Comp. St. 1901, p. 1412]). The amendatory act was approved March 3, 1903. It permits settlers to take homesteads on either surveyed or unsurveyed land in Alaska. It provides for staking the entry on unsurveyed land somewhat after the manner of locating a mining claim, for filing the notice of location thereof with the local recorder, and also provides for final proof and the issuance of a patent—

"Upon proof to be submitted to the register and receiver of the proper land office, upon proof that he is a citizen of the United States, and upon the further proof required by section twenty-one hundred and ninety-one of the Revised Statutes of the United States as heretofore and herein amended, and under the procedure in the obtaining of patents to the unsurveyed lands of the United States, as provided for by section ten of the act hereby amended." Chapter 1002, 32 Stat. 1028 [U. S. Comp. St. Supp. 1905, p. 328].

Now section 10 of the act of May 14, 1898, among other matters of procedure in the obtaining of patents to the unsurveyed lands of the United States, provides for the survey of the tract entered, the approval of such survey by the Land Department, and the filing of an application to enter.

"Whereupon, at the expense of the claimant, the register of such land office shall cause notice of such application to be punished for at least sixty days in a newspaper of general circulation published nearest the claim within the District of Alaska, and the applicant shall at the time of filing such field notes, plat, and application to purchase in the land office, as aforesaid, cause a copy of such plat, together with the application to purchase, to be posted upon the claim, and such plat and application shall be kept posted in a conspicuous place on such claim continuously for at least sixty days, and during such period of posting and publication or within thirty days thereafter any person, corporation, or association, having or asserting any adverse interest in, or claim to, the tract of land or any part thereof, sought to be purchased, may file in the land office where such application is pending, under oath, an adverse claim setting forth the nature and extent thereof, and such adverse claimant shall, within sixty days after the filing of such adverse claim, begin action to quiet title in a court of competent jurisdiction within the District of Alaska, and thereafter no patent shall issue for such claim until the final adjudication of the rights of the parties, and such patent

shall then be issued in conformity with the final decree of the court." Chapter 299, 30 Stat. 413 [U. S. Comp. St. 1901, p. 1469].

By the original section 1 of the act of May 14, 1898, which was the law under which defendant, Crary, initiated his entry in question, the homestead laws, including the acquisition of title under soldiers' additional homestead rights, were extended to Alaska, "subject to such regulations as may be made by the Secretary of the Interior." The fourth of these regulations provided that:

"(4) The act makes no direct provision for the surveying of lands sought to be entered as soldiers' additional homestead claims, and therefore special surveys must be made of such lands in the manner provided for in section 10 of this act, at the expense of the applicant."

Crary procured a survey to be made under this regulation, which survey was approved by the land office on February 9, 1904. Thereafter, and on March 7, 1904, he filed his application to enter the land, and, in compliance with the provisions of section 10 of the act of 1898, the four plaintiffs herein filed an adverse claim on April 19, 1904, and within 60 days, to wit, on May 11, 1904, began this suit in the District Court of the Territory of Alaska to quiet their title to the land.

This action is brought under a statute so nearly like section 2326, Rev. St. U. S.; (Act May 10, 1872, c. 152, § 7, 17 Stat. 93 [U. S. Comp. St. 1901, p. 1430]), in relation to the procedure in applications for patents for mining claims, and the decisions of the courts in such mining patent cases are so nearly in point, that this court feels constrained to be guided by the principles so well settled in those cases. It is true that section 10 of the act of 1898 only applies to Alaska, and that Congress enacted that the suit shall be an "action to quiet title"; but the general analogies and principles between the two classes of cases are the same. After filing his adverse claim, the adversary is required to "begin action to quiet title in a court of competent jurisdiction within the District of Alaska," but the

statute does not attempt to confer any or additional jurisdiction on the local court, nor in anywise to limit that which it now has, except to provide that the form of the action shall be an "action to quiet title." The action must be brought in the existing territorial court, in the mode prescribed by the existing territorial laws, and conducted to judgment according to the existing territorial Code of Civil Procedure. No limitation is made as to parties or practice, and the suit, when begun, shall be controlled as to parties, practice, procedure, and judgment entirely by the existing codes of law governing suits to quiet title between any other citizens of Alaska in relation to ordinary real property interests. Nome-Sinook Mining Co. v. Simpson, 1 Alaska, 578.

The objection made by the defendant to the intervention of 29 other lot claimants, who are similarly interested with the 4 original plaintiffs in this cause, will be overruled, in compliance with the opinion of this court on that point in the case of Nome-Sinook Min. Co. v. Simpson, supra, and they may have equal relief with the original plaintiffs in the final decree.

The District Court of Alaska is a court of general jurisdiction in civil, criminal, equity, and admiralty causes. Pol. Code, c. 1, § 4. Actions to quiet title to real property are specially provided for therein by the provisions of section 475 of the Alaska Code of Civil Procedure, which is as follows:

"Sec. 475. Any person in possession, by himself or his tenant, of real property, may maintain an action of an equitable nature against another who claims an estate or interest therein adverse to him, for the purpose of determining such claim, estate, or interest."

Plaintiffs were in possession of the real property. Crary claimed an estate therein adverse to them. They brought this "action of an equitable nature against [Crary], who claims an estate or interest therein adverse to [them], for the purpose of determining such claim, estate, or interest." Unless Crary is found to have a "claim, estate, or interest" in the prop-

erty of a higher nature—a better title—than plaintiffs' posses-sory rights, plaintiffs' titles must be quieted by the decree of this court. No question is raised but that defendant, Crary, complied with the procedure provided by Congress for dis-posing of the public lands under the laws relating to entry thereof through assigned soldiers' additional homestead certif-icates. If the land was subject to entry, his title must pre-vail, for his entry was initiated long prior to the entry of the plaintiffs on the land, and in such cases the first in point of time is first in point of right. But section 7 of the act of May 14, 1898 (chapter 299, 30 Stat. 412 [U. S. Comp. St. 1901, p. 1580]), under which act defendant claims the right to enter the land, provides:

"Sec. 7. That this act shall not apply to any lands within the limits of any military, park, Indian, or other reservation unless such right of way shall be provided for by act of Congress."

It is the general policy of the government of the United States not to grant a right of entry to settlers on lands reserved for public purposes. The regulations prepared by the Secre-tary of the Interior in virtue of the power given by section 1 of the act of 1898 provide that, on the completion of the sur-veys required by section 10, the surveyor make an affidavit duly corroborated by two witnesses—

"That no portion of said land is occupied or reserved for any pur-pose by the United States, or occupied or claimed by any natives of Alaska, or occupied as a town site or missionary station, or reserved from sale, and that the tract does not include improvements made by or in possession of another person, association, or corporation."

Such an affidavit, so corroborated, was made in support of Crary's entry.

The decisive question in this case is: Was the Crary tract within a military reservation, or within a tract actually oc-cupied by the military authorities for military purposes, when he attempted to make entry thereof? The undisputed evidence

of Capt. Abercrombie is that the tract of one mile square, within which Crary's claim was located, was reserved by him, acting under authority of general orders No. 51, in April, 1899, for military purposes; that he reported such action to the War Department, and that the withdrawal was approved by the Assistant Secretary of War. Abercrombie's report to the Secretary of War for the year 1899 was transmitted to the United States Senate by Secretary of War Elihu Root on January 23, 1900, and was printed as a public document. Defendant's Exhibit 8. It contained, among other evidences of the reservation and approval of this tract, a map, on which the tract is marked "Military Reservation." Defendant's Exhibit 8-a. It is my judgment that this evidence is sufficient to show an approval of the action of Abercrombie in reserving the tract by the Secretary of War, who acted therein for, and with the same legal effect as if it had been done by, the president.

It is also shown by the evidence that public funds, appropriated by Congress for that use, were expended on this tract in the erection of public buildings, quarters, stables, and telegraph office, and this has been held to be a sufficient evidence of a reservation to exclude the initiation of subsequent private entries. Wilcox v. McConnell, 38 U. S. (13 Pet.) 498, 512, 10 L. Ed. 264.

The evidence is quite conclusive that the military authorities actually held, used, and occupied this mile square from 1899 to July 25, 1902, at which date the greater part thereof, including all the property in litigation, was abandoned. This actual use and occupation by the military department was a sufficient withdrawal of the land from private entry, even if no formal order of withdrawal was shown. In the case of the appeal of Wilson Davis, the acting Secretary of the Interior laid down the rule that the establishment and occupancy of a cantonment by the military authorities excludes from entry, prior to a formal order of reservation, the land thus appropriated. 5

Decisions Department of Interior relating to Public Lands (page 376). And that view in that case was concurred in by both the War and Interior Departments. In that case and in this the land occupied was a part of the unoccupied public domain, and belonged to the United States when the owner through its military forces took possession, and the rule is well settled that during such use and occupancy no citizen may intrude thereon and acquire any private rights therein. Such actual occupation by the government is a sufficient notice of its intention to reserve such lands to prevent the initiation of pre-emption, homestead, or other private rights therein, and the fact of actual occupancy may be established by parol evidence. Morrow v. Whitney, 95 U. S. 551, 24 L. Ed. 456.

Other minor objections are urged against the recognition of the validity of this reservation in so far as it affects the land in controversy. The defendant insists that the whole square mile was not necessary for the military uses shown by the evidence, and that the Crary tract was not actually occupied by the military buildings. The answer is that this court has no jurisdiction to determine what area of public land is necessary to be included within a reservation for military purposes, nor does the validity of a reservation held by the actual use and occupation of the United States depend on covering every acre thereof with buildings. Another objection urged is that there was no record of the withdrawal of this mile square on file in the general land office. The existence of a military reservation does not necessarily depend on lodging proof of its withdrawal in the local or general land office; yet the official communications offered in evidence and signed by the commissioner of the general land office, dated February 18 and 19 and June 11, 1903, state that "you are further advised that your statements as to the continuance of military occupation and control up to July 25, 1902, agree with official information from the War Department received by this office last sum--

mer." Defendant also argues that the recognition of the claims of Von Gunther, Shepherd, and the Pacific Steam Whaling Company by the military authorities must be accepted as proof that there was no reservation; but the evidence showed that their claims were initiated to small tracts within the mile square prior to its reservation. Hence, action thereon, even by the Secretary of the Interior, allowing Von Gunther's claim, to allowance of which no adverse claims were filed, is not a conclusive argument in favor of the allowance of Crary's claim, which arose subsequent to the creation of the reservation. Morrow v. Whitney, supra.

I conclude that the tract of a mile square was legally reserved by the formal action of Capt. Abercrombie, acting under general orders No. 51 in April, 1899, and that such action was approved by the Secretary of War, acting for and in the name of the President, as early as January 26, 1900; that it was also reserved by actual use and occupation by the military authorities with troops, public buildings, and telegraph station in April, 1899, and therafter, and that such legal reservation continued of the whole tract of a mile square until July 25, 1902, when the greater part thereof, including the tract in controversy, was abandoned by the War Department, acting through Capt. Wilson. Defendant, Crary, initiated the entry of his claim for 16.02 acres within the exterior boundaries of the mile square on the 7th day of August, 1901, and bases his title thereto on a claim and surveys made of the tract prior to July 25, 1902, when it was restored to the public domain. He was not in actual possession of the tract on July 25, 1902, when it was thrown open to settlement, nor at any time subsequent thereto, when plaintiffs and interveners entered and built their houses. Defendant had no right in or title to the tract in controversy on July 25, 1902, and does not claim to have initiated any since that date. Plaintiffs and interveners have a possessory right therein, initiated on July 25, 1902, and sub-

sequent thereto.  Defendant's wire fence was not intended by him to be the initiation of a new claim, but the continuance of his entry begun in 1901.  It was not sufficient, under the evidence in this case, to bar other settlers from entering peaceably and settling on the land after the abandonment of the reservation.

It is the judgment of this court that plaintiffs and interveners have the only legal or lawful "claim, estate, or interest" in the premises in dispute, and a decree will be entered quieting their titles against the illegal claims of the defendant, arising through his attempt to enter the tract as a soldier's additional homestead.