**H. Arthur WILLIS et al., Appellants,**

v.

**CITY OF VALDEZ, Appellee.**

**No. 2332.**

Supreme Court of Alaska.

Feb. 23, 1976.

Randall E. Farleigh of Robinson, Mc-Caskey, Reynolds, Frankel & Lekisch, Anchorage, for appellants.

Kenneth P. Jacobus of Hughes, Thorsness, Lowe, Gantz & Powell, Anchorage, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

## OPINION

RABINOWITZ, Justice.

This appeal arises from two quiet title actions, consolidated, involving lands within U. S. Survey No. 455 located in the area of Valdez, Alaska. The heirs of George Love claim ownership of lands in U. S. Survey No. 455, pursuant to the United States Patent issued to George Love in 1910 under soldiers' additional homestead entry scrips.[1] The city of Valdez claims an interest in Lot 32, Block 37, First Division, through a deed dated August 25, 1971, from Andrew Engstrom, which is in the chain of title stemming from a 1907 quitclaim deed from George Love to North Valdez Land Company. Appellants, the heirs of Love, argue here that the superior court erred in entering partial summary judgment dismissing their claims. The superior court held that the

---

1. 43 U.S.C. § 271 provides:

Soldiers and sailors entitled to make entry generally

Every private soldier and officer who served in the Army of the United States during the recent rebellion for ninety days, and who was honorably discharged and has remained loyal to the Government, including the troops mustered into the service of the United States by virtue of the third section of an Act approved February 13, 1862, and every seaman, marine, and officer who served in the Navy of the United States or in the Marine Corps during the rebellion for ninety days, and who was honorably discharged and has remained loyal to the Government, and every private soldier and officer who served in the Army of the United States during the Spanish war, or during the suppression of the insurrection in the Philippines for ninety days, and who was or shall be honorably discharged; and every seaman, marine, and officer who served in the Navy of the United States or in the Marine Corps during the Spanish war, or during the suppression of the insurrection in the Philippines for ninety days, and who was or shall be honorably discharged, shall, on compliance with the provisions of sections 161–164, 169, 171, 173, 175, 183, 184, 191, 201, 211, 239, 254, 255, 271, 272, 274, 277 and 278 of this title, as hereinafter modified, be entitled to enter upon and receive patents for a quantity of public lands not exceeding one hundred and sixty acres, or one quarter section, to be taken in compact form, according to legal subdivisions, including the alternate reserved sections of public lands along the line of any railroad or other public work not otherwise reserved or appropriated, and other lands subject to entry under the homestead laws of the United States; but such homestead settler shall be allowed six months after locating his homestead and filing his declaratory statement within which to make his entry and commence his settlement and improvement.

43 U.S.C. § 274 provides:

Additional entry by veteran

Every person entitled, under the provisions of section 271 of this title to enter a homestead who may have, prior to June 22, 1874, entered, under the homestead laws, a quantity of land less than one hundred and sixty acres, shall be permitted to enter so much land as, when added to the quantity previously entered, shall not exceed one hundred and sixty acres.

quitclaim deed of 1907 from George Love to North Valdez Land Company conveyed an equitable interest in U. S. Survey No. 455 which was capable of carrying with it the subsequently acquired title received by George Love through patent from the United States government in 1910.

The relevant facts are not complicated. In 1898 George Love received an assignment of the soldiers' additional homestead entry scrip of Winfield Evans from A. A. Thomas. Then, in 1902, Love obtained a separate assignment of a soldiers' additional homestead entry scrip, consisting of 40 acres, of Nathanal Kimball from Frederick W. McReynolds. In 1906 Love and three others executed the articles of incorporation of the North Valdez Land Company. In addition to acting as an incorporator, Love was a stockholder and initial director of the company. The articles of incorporation described the objects of the company to include the acquisition of lands. Two months after the North Valdez Land Company's articles of incorporation were executed, United States Survey No. 455 was approved. While there is no official record of a request for survey, the 1905 surveyor's notes refer to the land encompassed within United States Survey No. 455 as being claimed by George Love.

On October 12, 1907, Love conveyed his interest in United States Survey No. 455 by quitclaim deed[2] to the North Valdez Land Company. In early March of 1908, Love executed affidavits of publication and posting regarding his application for the lands encompassed within U. S. Survey No. 455. In mid-March the North Valdez Land Company filed its certificate of incorporation. Then, in late March, Love executed formal application for the land within U. S. Survey No. 455 as assignee of the soldiers' additional homestead entry scrips. In February of 1910, final certificate was issued to Love. This certificate acknowledged Love's payment of fees and entry to the 159.98 acres within U. S. Survey No. 455. In July of 1910, patent was issued to Love.

As is evident from the above, at the time George Love conveyed the lands in question to North Valdez Land Company (in 1907) he did not have title. Further, it was not until March of 1908 that the North Valdez Land Company completed the necessary steps to become legally incorporated under territorial law. These two points provide the basis for appellants' appeal. First, they argue that North Valdez Land Company was not, at the time of conveyance, a corporation in fact or law[3] because the company had no legal existence, and therefore Love's 1907 conveyance to it was void. Second, appellants assert that Love himself did not have a suf-

---

2. The quitclaim deed which conveyed U. S. Survey No. 455 employed in part the following phraseology:
   Together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or anywise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and property thereof. To have and to hold, all and singular the said premises, together with the appurtenances, unto . . . [North Valdez Land Company], and to its successors and assigns forever.

3. Section 801 of the Compiled Laws of Alaska (1913) describes the point of corporate existence to be when the articles of incorporation have been "filed and recorded." Thus, at the time of Love's 1907 conveyance, North Valdez Land Company was not a corporation de jure.

Appellants also argue that the North Valdez Land Company was not a corporation *de facto* at that time either. The necessary conditions for operation of the doctrine of *de facto* incorporation are colorable compliance with the laws of incorporation and good faith. *H. J. Hughes Co. v. Farmers' Union Produce Co.*, 110 Neb. 736, 194 N.W. 872 (1923) ; *cf. Jefferson v. State*, 527 P.2d 37 (Alaska 1974). It is generally agreed that one cannot even be said to colorably comply with applicable law until taking the basic step of filing the corporate articles. *Kiamesha Dev. Corp. v. Guild Properties*, 4 N.Y.2d 378, 175 N.Y.S. 2d 63, 151 N.E.2d 214 (N.Y.1958), 2 Model Business Corp. Act ¶ 50, § 4. Since the necessary condition of colorable compliance was not met, North Valdez Land Company was not a corporation *de facto* at the time of Love's 1907 conveyance.

ficient interest at the time he made the 1907 conveyance to result in the conveyance carrying with it the title he subsequently acquired by virtue of the 1910 patent.

We find appellants' first argument unpersuasive. Assuming that the North Valdez Land Company was not a corporation *de jure* or *de facto*, Love and his successors in interest may still be estopped from denying the corporate existence of his 1907 grantee, the North Valdez Land Company. Appellee argues that at the time in question the North Valdez Land Company was a corporation by estoppel. "Corporation by estoppel" is actually a misnomer for the result of applying the policy whereby private litigants may, by their agreements, admissions, or conduct, place themselves in a position where they will not be permitted to deny the fact of the existence of a corporation.[4] Because estoppel as a doctrine is concerned with the acts of the parties, as opposed to the legality of the corporation itself, we think the better rule is that the corporation by estoppel doctrine may be employed even when the corporation has not achieved *de facto* existence.[5]

As a general rule, promoters, stockholders, and members of a corporation are estopped to deny its corporate existence where they have participated in holding it out as a corporation. In the case at bar George Love was an incorporator, stockholder, and director of North Valdez Land Company. Further, review of the record shows that Love never took any action which was inconsistent with the notion that the North Valdez Land Company was a legal corporation. It was to this entity which Love conveyed the land in question. Thus, we hold that the heirs of George Love, being in privity with him, are estopped from denying the existence of North Valdez Land Company as a corporation at the time of the 1907 conveyance.[6]

There remains the more complicated question of whether Love's conveyance of his interest by the 1907 quitclaim deed after survey was approved, but prior to actual application under the scrip for patent, was sufficient to take with it the 1910 title acquired by virtue of the patent issued to George Love. Appellants concede that soldiers' additional homestead rights are personal property and freely alienable.[7] Such transfers concern rights

---

4. *Cf.* 8 W. M. Fletcher, Cyclopedia of the Law of Private Corporations (1966 rev'd ed.) § 3889 [hereinafter cited as Fletcher].

5. *Id.* at § 3902.

6. Additionally, we recognize decisional law to the effect that a person who conveys real property to an association as a corporation cannot avoid the conveyance by denying the corporate existence of the grantee. 8 Fletcher, *supra* note 4, § 3958. *Bukacek v. Pell City Farms, Inc.*, 286 Ala. 141, 237 So.2d 851 (1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 872, 27 L.Ed.2d 809 (1971) ; *Jolley v. Idaho Securities, Inc.*, 90 Idaho 373, 414 P. 2d 879, 888 (1966).

7. The purpose and policy of the Soldiers' Additional Homestead Rights Act is well discussed in *Barnes v. Poirier*, 64 F. 14, 18 (8th Cir. 1894) (citation omitted, emphasis added), where the court said:

The purpose of the [original Soldier's Homestead Rights Act] was to induce the permanent settlement of the donee upon, and the continued occupation and cultiva-

tion by him of, the land granted. Hence the requirements of settlement, cultivation, and occupation for a long period of time before entry, and of the affidavit of the homesteader at the time of final entry that he had not alienated any of the land, and hence the inevitable conclusion that any sale or contract of sale of the right to enter the land or of the land to be entered under these sections was an evasion of one of the main purposes of the act, and was against public policy and void. But the beneficiary of the grant under [the Soldier's Additional Homestead Rights Act] had already selected, settled upon, cultivated, and acquired his homestead from the public domain, and was presumably in the occupation of it before that grant was made. The purpose of the grant under that section surely was not to induce him to abandon his homestead, and make a new settlement on the new grant. It was rather to reward him for the services he had already rendered as a soldier in suppressing the Rebellion, and as a farmer in establishing his home upon, cultivating, and occupying that portion of

independent of interests in land; rather they concern legal privileges to enter land. At the other end of the spectrum, land owned in fee is also freely alienable. Thus, at the point when an applicant receives a federal patent to land, it may be sold. The issue we must determine then, is at what point in the pre-patent chain of procedures does a person have a sufficient interest in a particular tract of land to convey that land by quitclaim deed.

It is established that public land can be conveyed by a possessor of a soldiers' additional homestead right prior to actually obtaining patent. In *Webster v. Luther*, 163 U.S. 331, 16 S.Ct. 963, 41 L.Ed. 179 (1896), application to enter was dated 1887 and patent granted in 1888. In an action by the holder of a quitclaim deed issued in 1890, the prevailing party's warranty deed (dated on the same day in 1887 that the application to enter was filed) was im-

pliedly held to have conveyed the land. As a matter of law then, public land can be conveyed by a possessor of a soldiers' additional homestead right prior to actually obtaining patent; the patent will issue in the name of the original entryman but the land will belong to the person receiving the pre-patent conveyance. Further, it has been held that the conveyance before patent may be made by quitclaim deed.[8] *Gilbert v. McDonald*, 94 Minn. 289, 102 N.W. 712 (1905).[9] In *Gilbert*, the court stated that

> [u]nder the authorities referred to, we consider the question settled in this state that when patent issues it furnishes evidence of title in the patentee from the *very inception* of the proceedings to acquire title.[10]

Appellants argue that assuming all that is necessary to support a conveyance is an application for patent, even that was lack-

the public domain he had already entered as his homestead. *Hence it was that no settlement, no cultivation, no occupation, no affidavit of nonalienation, no affidavit at all was made a condition precedent to the enjoyment of the benefits of this grant or to the entry of the additional land under this section. The beneficiary was left free to select this additional land from any portion of the vast public domain described in the act, and free to apply it to any beneficial use that he chose. It was an unfettered gift in the nature of compensation for past services. It vested a property right in the donee.* The presumption is that congress intended to make this right as valuable as possible. Its real value was measured by the price that could be obtained by its sale. The prohibition of its sale or disposition would have made it nearly, if not quite, valueless to a beneficiary who had already established his home on the public domain. Any restriction upon its alienation must decrease its value.

8. Quitclaim deeds normally do not transfer after-acquired interests or after-acquired title. *E. g., Ott v. Pickard*, 361 Mo. 823, 237 S.W. 2d 109 (1951); *Reasor v. Marshall*, 359 Mo. 130, 221 S.W.2d 111, 115 (1949); Annot., 44 A.L.R. 1266, 1276; 162 A.L.R. 556, 566. However, a quitclaim deed can transfer equity in property, including the equitable right to acquire a title by means of soldiers' additional homestead entry scrip.

9. The theory of the *Gilbert* case is that prior to patent an equitable title exists which ripens into legal title inuring to the benefit of the grantee claiming under the quitclaim deed. Thus, what the grantor conveys by quitclaim deed is an equitable interest. *Compare Kelly v. Southworth*, 38 Wyo. 414, 267 P. 691 (1928).

The nature of rights secured under soldiers' and sailors' entry in 271 to 274, 43 U.S.C. has been treated differently for the purposes of alienation prior to patent than those obtained under normal homestead entry. *Compare Anderson v. Carkins*, 135 U.S. 483, 10 S.Ct. 905, 34 L.Ed. 272 (1890) *with Anderson v. Clune*, 269 U.S. 140, 46 S.Ct. 69, 70 L.Ed. 200 (1925). The absolute grant to soldiers and sailors, as opposed to the conditional grant to normal homestead entrymen, provides a basis for permitting alienation prior to patent for the former while restricting the latter's rights of alienation until the issuance of patent.

10. Emphasis added. The "authorities" the court referred to hold that an applicant for patent had a right to possession of the land, after application but prior to patent, as against a trespasser and could sue for damages for trespass from the time of application. In this regard, see *Burr v. House*, 3 Alaska 641 (1909), where the court held that mere settlement on open lands, absent a patent, vests the settler with a property right good against every one but the government.

ing here. They also cite several cases which they claim show that an applicant for patent has no right to the land. Appellants reason that if an applicant for a patent possesses no right to the land he conveys, then a fortiori George Love, who had not yet applied for a patent, had no rights to a particular piece of land which he could convey. If appellants' case law supported the proposition that one who claims land prior to patent being issued has no right to the land, it would conflict with the authority to which we have alluded. But, in fact, the cases appellants cite are not in conflict with *Webster* and *Gilbert*. Our study shows that they do not stand for the broad proposition which appellants would have us draw from them. Typical of the authorities relied on by appellants is *Robinson v. Lundrigan*, 178 F. 230, 233 (8th Cir. 1910). In *Robinson* the question the court actually resolved was ". . . whether or not a person who applies to enter public land with a void [sic] additional right is entitled, after his invalid application has been rejected, to a grant of additional time within which to obtain another right with which to enter the land where a valid application for the land has been received, and is pending, at the time the holder of the invalid right makes his application for additional time." The *Robinson* court held that an applicant for land under a void scrip had no right to extra time to obtain a valid scrip and reapply for patent. In short, if the basis of a claim is void, there is no claim. There is no allegation in the instant case, nor in the cases we discussed *supra*, that the applicants for patent held void scrip. Thus, we conclude that the cases appellants cite are not in point with the instant discussion.

Since Love had not applied for patent at the time of the 1907 conveyance, we must determine whether Love possessed any pre-application interest in the land which would furnish a foundation for the superior court's conclusion that Love had an interest capable of being conveyed and capable of taking with it after-acquired rights.[11]

Appellee's argument in support of the superior court's ruling is that at the point where proceedings to obtain a particular tract of land were begun, rights to the land attached. A conveyance of these rights to a third party would also serve to vest after-acquired rights, such as title, in the third party provided that those after-acquired rights emanated from the same claim from which the earlier transferred rights were based. In short, once proceedings to obtain patent are initiated, a transfer of rights arising from those proceedings includes the right to eventually obtain patent to a piece of land. We find this reasoning to be in accord with the decisions we have cited holding that public land may be conveyed by a possessor of soldiers' additional homestead entry scrip prior to obtaining patent.[12]

We must still determine the point at which a party acquires rights to a particular piece of property, assuming he subsequently proceeds to obtain patent. We think that logic dictates that this point must be the inception of proceedings to acquire a title. In the Soldiers' Ordinary Homestead Act (43 U.S.C. § 271), the inception of proceedings is the filing of a declaratory statement. Soldiers' Additional Homestead Act rights to locate land would be analogously exhausted when the inception of the proceedings took place and rights were located on a specific tract. While in the major portion of the country the first step toward acquiring particular land was the filing of a statement naming the property by reference to the existing rectangular survey system, the procedure in Alaska was different. For any claim in Alaska, where the system of rectangular surveys had not been extended, a special survey had to be made. Thus, the request

---

11. We are not concerned with the analogous issue of estoppel by deed, since Love conveyed by quitclaim deed.

12. *See, e. g.*, those cases discussed in text accompanying note 8, *supra*.

for survey, or the survey itself, was the first document filed to initiate a Soldiers' Additional Homestead Rights Act land claim.[13] Record claim was initiated by an application made to the surveyor general for a survey.[14] Appellee's argument that request for survey or actual survey constitutes a sufficient "setting aside" of land to constitute the inception of proceedings to obtain that land under the act is persuasive. Assuming the claim is followed through to patent, it is eminently reasonable, under the conditions existing at the turn of the century in the Territory of Alaska, to regard title as dating back to survey; it is at that point that a particular piece of land is associated with a particular scrip. In *In re Northwestern Fisheries Co.*, 39 L.D. 598 (1911), an administrative decision of First Assistant Secretary Pierce of the Department of the Interior, subsequent to survey but prior to application, Presidential Proclamation of February 16, 1909 withdrew public lands for addition to Tongass National Forest. The opinion held that the survey and approval of same gave the applicant a claim which could not be defeated and which could be carried to patent.[15] Since this is the only decision we have located which concerns rights prior to application for patent under the Soldiers' Additional Homestead Act, we think it appropriate to quote at length from this decision.

With reference to the assertion of claim involved in the preliminary steps for the survey of this land, it seems clear that the survey thereof in the field and the approval of such survey by the surveyor-general, February 11, 1909, was a legal appropriation under the public land laws and whatever rights attached by such approval, were not defeated by the withdrawal. The evident purpose of the exception in the proclamation was to protect such claims if they were thereafter diligently prosecuted to final entry. Under the law and regulations one desiring to locate a Soldiers' Additional Homestead Right in Alaska, might have survey of the land intended to be located, and after approval by the surveyor-general file the plat of such survey in the

---

13. The matter is discussed in *Opinion of the Attorney General*: Feb. 25, 1899, 28 L.D. 149 (1899), as follows:

By the terms of the statute (section 2306, Revised Statutes), the Soldiers' Additional Homestead Right is limited to the entry of 'so much land as, when added to the quantity previously entered shall not exceed one hundred and sixty acres.' When this right of entry is exercised upon surveyed land, as it must be, if exercised at all, outside of Alaska, the land *must* be taken according to legal subdivision. . . . Section one of the act of May 14, 1898 (30 Stat., 409), among other things, grants the right to enter unsurveyed lands in the district of Alaska under provisions of law relating to the acquisition of title through Soldiers' Additional Homestead Rights. Public lands in Alaska are *not surveyed* and no provision has been made for extending over them the system of public surveys. . . . Land cannot be entered there as an additional homestead, by legal subdivisions, because there are no such subdivisions. It is essential, however, to the allowance of entry that the land shall have been surveyed, and provision is made in the fourth paragraph of circular instructions, issued June 8, 1898, under the said act (27 L.D. 248), for the

necessary survey, in the following language: 'The act makes no direct provision for the surveying of lands sought to be entered as Soldiers' Additional Homestead claims, and therefore special surveys must be made of such lands in the manner provided for in section 10 of this act, at the expenses of the applicant.'

By means of the special survey the acreage to which an applicant is entitled under Additional Homestead Right may be definitely described and separated from the body of the public lands. . . .

*See also Gavigan v. Crary*, 2 Alaska 370 (1905).

14. Section 10, Reg. 32 (27 L.D. 261); *but cf.* 37 L.D. 160 (1908).

15. The proclamation stated in part that, "[t]he withdrawals made by this proclamation shall, as to lands which are at this date legally appropriated under the public land laws, . . . be subject to and shall not interfere with or defeat legal rights under such appropriation. . . . ." Thus, the Secretary in *In re Northwestern Fisheries* had to determine what constituted "legal rights;" the proclamation itself did not define legal rights or state what category of rights was to be recognized.

local land office. These steps are preliminary to actual location in the land office and are rendered necessary because of lack of government surveys in said district. Can it be said that another might appropriate a tract as against one proceeding in conformity with department regulations to identify it by appropriate survey before making entry? If not, it must be because such prior claimant had initiated a claim which might ultimately ripen into a legal right. Under such circumstances the claimant should not be denied the right to perfect his claim unless he has been guilty of negligence. . . . In the case under consideration the law gave, as has been seen, the right to locate Soldiers' Additional Rights upon unsurveyed lands in the District of Alaska and the regulations under the law authorized the actual location of the scrip. The survey here in question was made as the regulations provided, was preliminary to the location, and was limited to the location and in furtherance thereof. The area embraced in the survey coincides with the extent of the company's claim, and if it has complied with the further provisions of the law and the regulations governing the acquisition of lands in Alaska in the exercise of Soldiers' Additional Rights, its claim must be sustained.

Appellants attempt to distinguish *Northwestern Fisheries* by arguing that the rationale of that case was based on the clear language of the presidential proclamation which did not intend to prejudice claims which were being processed. This is not persuasive insofar as the significance of *Northwestern Fisheries* is that it recognizes a claim to particular land, based on a scrip, from the point in time when application for survey was made.

Suggesting a contrary conclusion to *Northwestern Fisheries* is the circular issued by the Department of the Interior on September 12, 1908, published in 37 L.D. 160. As codified in 43 C.F.R. 132.13 (1938), the circular provided that an application under the Soldiers' Additional Homestead Act ". . . does not segregate the land or prohibit the filing of other applications . . . until after the allowance of the entry. . . .", which leads to the questions what "segregate" means and for what purposes is the land not segregated. Since this circular preceded the decision in *In re Northwestern Fisheries*, we conclude that the words ". . . segregate the land or prohibit the filing of other applications for such land. . . ." should be read together as meaning that until entry is allowed others may also apply for the land.

Thus, we conclude that in the Territory of Alaska, at the time of Love's 1907 conveyance to the North Valdez Land Company, Love's request for survey initiated a claim to the land requested. Appellants admit that Love requested survey on July 1, 1905.[16] We conclude that since Love requested the survey on July 1, 1905, he therefore had existing rights to the lands encompassed within U.S. Survey No. 455 at the time in 1907 when he conveyed his interests in these lands to the North Valdez Land Company. We further conclude that the United States Patent issued to Love in 1910 inured to the benefit of the North Valdez Land Company under the 1907 quitclaim deed it received from Love.

The judgment of the superior court is affirmed.

16. While there is no formal request for survey, the surveyor's notes, which constitute part of this record, repeatedly refer to U. S. Survey No. 455 as being a survey of land claimed by George Love.