FUNAKI OFA, MANASE KATOA, TOGINOA LAGOIA,
VILIAMU PRESCOTT, MASINA OFA, SIONE TAKUTALAMI,
TOPULUKA TUAMOHELOA, AMELIA P. SIALE,
SIONE L. SIALE, et al., Plaintiffs

v.

TONGAN WESLEYAN CHURCH OF AMERICAN SAMOA
and NETANE TUIPULOTU VI, Defendants

High Court of American Samoa
Trial Division

CA No. 13-88

September 29, 1988

Before KRUSE, Associate Justice, LUALEMAGA,
Associate Judge, and VAIVAO, Associate Judge.

Counsel: For Plaintiffs, Asaua Fuimaono
        For Defendants, Charles Ala'ilima

The plaintiffs were lately members of the defendant Tongan Wesleyan Church of American Samoa, hereinafter the "Church." They have recently separated from the Church and have filed suit essentially seeking a liquidated share of the Church's assets accumulated to date to aid in their setting up another religious institution to be administered more to their own liking. The evidence does not disclose a "schism," as the term is used in ecclesiastical circles;[1] rather, the falling out is attributable to matters more in the nature of the mundane and temporal order --- fiscal policy. The disaffection is deeply seated, yet the roots of the quarrel --- investment of Church funds in additional reality versus investment of those funds in a bus --- belies its resultant prominence.

## FACTUAL BACKGROUND

With emerging immigration to the territory, a number of Tongan nationals had, by the year 1976, become resident in the Western District. This in turn gave rise to the common desire to worship and gather as a community. The early beginnings of organized religious gathering arose in Le Puapua, Leone. A small grouping of Tongan households then began assembling in borrowed housing for worship in their native tongue employing the teachings, customs, and usages as established by the Methodist Church in Tonga, hereinafter the "Church in Tonga."

Among those early organizers were plaintiffs Funaki Ofa and Manase Katoa and defendant Rev. Netane Tuipulotu Vi, who also conducted the religious services. (At that time, Rev. Vi was a recognized "lay preacher" having completed certain theological schooling under the auspices of the

---

[1] A schism has been said to be a division "on account of some doctrinal difference of opinion with regard to matters of faith or discipline or the offense of causing or seeking to cause such a division." Protestant Reformed Church v. Tempelman, 81 N.W.2d 839, 844 (Minn. 1957).

111

Church in Tonga. He had, however, yet to be fully credentialed as a Pastor.)

At the outset there were no written articles of association nor rules governing the assembled membership, however, all were familiar with the organizational traditions of the Church in Tonga. The affairs of the early assemblies were conducted accordingly: they held regular meetings of an organizational nature; they conducted elections of officers; and established books of accounts. In the course thereof, plaintiff Funaki Ofa featured from the onset in the administration of the Church. He was repeatedly elected to the lay leadership position, a post second only to the Pastor following the hierarchical traditions established in Tonga.

The need for a more permanent location for worship was soon realized and the membership set about to raise funds. The event which proved popular was the Tongan fund raising social, kava dances. This involved invitations to the Tongan community at large to share kava with the fund raisers. It is customary and anticipated at these functions that individual families or other appropriate groupings would perform dance items which in turn attracted monetary donations from the audience. Donation totals for each item would be made known and accordingly the dance groups would compete spiritedly for donative favor as well as for some nominal prize at the conclusion.

In the year 1980, sufficient funds had been raised to buy a plot of land in Tafuna. A deed was executed and delivered by the grantor to a nominated "trustee for The Tongan Wesleyan Church in American Samoa." In time a chapel and attendant buildings were erected on the land.

Shortly after the land purchase, some questions arose regarding the Church's status as a cognizable legal entity, and therefore its ability to own land in American Samoa. The evidence went on to show that Rev. Vi, with the aid of certain American Samoan nationals who were non-church members, incorporated an eleemosynary corporation pursuant to the laws of the territory. (A.S.C.A. §§ 30.0201 et seq.) The corporation was named the "Tongan Wesleyan Church in American Samoa" and the Articles of Incorporation designated "Tafuna" as the principal place of business. The general

112

corporate purpose reads as follows: " . . . to preach the Gospel of the Blessed God, and to confirm and strengthen the faith of those called into the fellowship of His Son, Jesus Christ," and ancillary to this general purpose, the Articles further empowered the corporation to acquire property.

With corporate status, a general meeting was soon thereafter convened to explain incorporation to the membership. This included the assistance of a Tongan legal practitioner who was invited to discuss in the Tongan language the desirability of incorporation and the requirements of corporate existence. The Court was not presented with any minutes of this meeting, however certain factors consistent with ratification were borne out by the testimony. Firstly, there was no definite objection registered at the meeting regarding a change in status. Secondly, all subsequent annual meetings have been held pursuant to the Articles. Thirdly, corporate status was invoked by the Church's administration to independently sponsor Rev. Vi as permitted by applicable immigration laws.[2]

The evidence also disclosed that from the time of fund raising, Rev. Vi took extended visits abroad. These extended visits were in part explained on the evidence as church related business but also in part left as unexplained absences. Nonetheless, the Reverend would return each time and resume his office without question from anyone. This situation at least existed until his last return (after another lengthy absence) in April, 1986, where he encountered bitter dissension among his flock.

---

[2] At the instigation of the Church's administration, Rev. Vi was secured the status of "Pastor" from the Church in Tonga. By letter dated 24 May 1982 under letterhead of the Methodist Church in Tonga, and intended for appropriate government agencies in Samoa, Rev. Vi was introduced as "promoted to be a Pastor and now he is to take care of the Tongan Church at Tafuna until further notice." As such, Rev. Vi was apparently accepted by immigration officials as eligible for immigration sponsorship by the local body corporate.

The background to this dissension is as follows: during Rev. Vi's off island sojourns, plaintiff Funaki Ofa would, by reason of his elected office, properly assume leadership of the Church's affairs including religious services. The latter's experience with day to day power was, therefore, correspondingly extended, so much so that in our opinion, Mr. Ofa apparently lost sight of that source of power. Early in 1986 and prior to Rev. Vi's last mentioned return to the island, Mr. Ofa had proposed to the membership the expenditure of church funds to acquire some nearby land. The bank account at the time reflected some $39,000 in savings. This proposal was first rejected at a meeting of the officers called by Funaki Ofa. After strongly chastising the executive body for their considered lack of foresight, Mr. Ofa advised that he would put the issue before the membership at the next gathering for services. In Mr. Ofa's judgment, the investment opportunity was too important to be passed up. The issue was put to a vote and similarly the membership turned down the proposal, favoring the alternative idea of investing in a church bus. The continued refusal by the majority to endorse Mr. Ofa's idea escalated to growing ill will and the development of a distinct faction in support of Mr. Ofa. The remainder of the membership was steadfast and was content to await the return of Rev. Vi, the avowed leader of the Church, to put an end to the dissension. The setting for a power struggle had thus emerged.

Rev. Vi upon his return also found that his leadership status was questioned by the Ofa faction in the light of the his extended absences. Indeed his sponsorship status with the immigration authorities was not kept current by plaintiff Ofa, who apparently attempted to have his own name registered instead under church sponsorship.

The discontent finally reached the Church in Tonga. In a recorded audio message to the membership in Tafuna, Tonga's officialdom recommended that both Rev. Vi and Mr. Ofa step down from further leadership roles pending the upcoming annual elections in the month of December. It was also suggested that in the interim all further religious services and other affairs of the Church, including the conduct of elections, be placed in

114

the hands of a Rev. Fangupo of the Tongan Methodist Church in Fagatogo.

The suggestions from Tonga were apparently acceptable to both sides and lifted the focus of attention from continuing discord to the return to undisrupted worship.

On the appointed day for the annual meeting, the elections under the supervision of Rev. Fangupo resoundingly endorsed Rev. Vi's leadership. Yet the struggle did not end there. Subsequent Sunday services were continuously disrupted by Mr. Ofa and members of his family. He began complaining about the elections, accusing Rev. Vi and his followers of engineering the attendance of new faces on election day. There followed attempts to reconcile but they were to no avail. Mr. Ofa's defiance continued to disrupt services and eventually the Church's secretary was instructed to write a letter to the Ofas to inform them that their attendance at church was no longer welcomed and to notify them of their removal as members of the Church.

At this time, Mr. Ofa and his family no longer attend services with the defendant church. Together with the other plaintiffs, the Ofa household now worships again under borrowed housing. Finally, the evidence did not disclose the Church in Tonga as having taken a further hand in the matter which now has found its way into the secular courts.

## DISCUSSION

As noted at the outset, plaintiffs seek a liquidated share of the Church's assets. They seek dissolution on a number of grounds. The first of these is premised on the claim that the Church as a body corporate is a sham and thus subject to an Order to wind up its affairs, to sell its assets, and the proceeds of the assets given over to "an equitable distribution." The principal contention here concerns the setting up of the corporation by Rev. Vi aided by non-church members. Plaintiffs' position at trial was that the initiative taken by Rev. Vi to incorporate the Church was unauthorized by the membership as a whole and that the involvement of non-church members as incorporators demonstrated a sham. Plaintiffs further took the stance that the fact of incorporation was

115

inconsistent with what they had believed was the true status of the Church. This belief is that the Church was originally formed on the understanding, that the same was subject to the control of the Church in Tonga, and that all Church assets were accordingly controlled by the Church in Tonga. It is argued that incorporation was in derogation of this control and attempted to separate the local church from the Church in Tonga. In this regard the allusion appears to be to the difference between the "hierarchical" or presbyterian type of church government on the one hand, and the strictly "congregational" or independent type of church government on the other. With the former type, ecclesiastical government rests in a superior general church organization of which the local church is an organic part. With the latter type, the local church is seen supreme in all of its affairs and its government vested in the membership. While the local church might still be affiliated with a general church, it is merely confederated therewith in polity. See generally Watson v. Jones, 80 U.S. (13 Wall.) 666 (1871).

These arguments by which plaintiffs now seek to justify dissolution are lacking in conviction. Obviously while the status quo was to plaintiffs' liking, they thoroughly endorsed the very state of affairs which they now complain of as being a nullity. Plaintiffs cannot now be heard to complain or to question the validity of incorporation after having participated in the Church's affairs and having dealt with the Church as a corporate entity for some years. In these circumstances, plaintiffs are estopped from denying the validity of corporate existence. See, e.g., Willis v. City of Valdez, 546 P.2d 570 (Alaska 1976); Congregation B'Nai Abraham v. Arky 20 S.W.2d 899 (Mo. 1929). The testimony reveals that the Church was given corporate status some five years prior to the division. The lack of objection noted at the membership's initial gathering to consider the requirements of corporate existence infers general consensus and subscription by the membership to corporate existence. This meeting may be viewed as an organizational one, and subsequent dealings by the membership, including the holding of elections in accordance with the Articles of Incorporation, and indeed the assumption of elective offices thereby by plaintiffs Ofa and Katoa, all point to ratification of the incorporators' actions by the membership.

116

In his testimony, plaintiff Katoa took credit for petitioning the Church in Tonga to have Rev. Vi appointed to the status of Pastor while plaintiff Ofa, in seeking immigration sponsorship of Rev. Vi by the Church, did in fact hold out the Church as a duly organized body corporate to the Government of American Samoa. The attempt now by plaintiffs to discredit the Church's corporate status as a sham rings rather hollow. If anything, the evidence before us sustains the conclusion that the Church was duly incorporated as a religious organization pursuant to the laws of American Samoa.

Among other things, it was clear on the evidence that the Church was incorporated to settle any doubts about its entitlement to hold land. The incorporation was effectively accomplished and we find no evidence to the contrary that the corporation was other than a <u>de jure</u>, if not at least a <u>de facto</u>, entity. As such, the validity of its corporate existence may not be collaterally attacked, as it is here, to determine title to property after a dispute between members. <u>See</u> <u>McAuliffe v. Russian Greek Catholic Church</u>, 36 A.2d 53 (Conn. 1944) <u>cert. denied</u> 323 U.S. 726; <u>Congregation B'Nai Abraham v. Arky</u>, <u>supra</u>. Notwithstanding, the argument, that the incorporation exercise was a sham because of non-member incorporators, fails to impress. As noted above, these non-members were American Samoan nationals. Their involvement reflected no more than the statutory requirement that the majority of incorporators of an eleemosynary corporation must be United States nationals. A.S.C.A. § 30.0201. Any suggestion of wrongdoing on the part of Rev. Vi is clearly unwarranted, and we fail to see the involvement of non-church members in the incorporation process as giving rise to a sham. Again the argument lacks merit in view of ratification.

On plaintiffs' point regarding incorporation as effecting the Church's change in status from "hierarchical" to "congregational" and thereby justifying dissolution, the contention fails to advance plaintiffs' cause one way or the other. Assuming that the evidence sustained plaintiffs' claim that the Church was hierarchical or presbyterian in organic make up, the fact remains that there was never any disagreement whatsoever between Tonga and the defendants. Indeed, if local church government was subject to the jurisdiction

117

of the Church in Tonga, the ecclesiastical measures taken towards resolving the dispute were in exact accordance with the recommendations from the Church in Tonga. These measures were apparently acceptable to plaintiffs, as well as defendants, and the results thereof presumably in accord with the Church in Tonga as the latter has taken no further action. Plaintiffs nonetheless pray this Court to dissolve the Church because things did not go their way.[3] The prayer is clearly inconsistent with early established law that a person who voluntarily joins a religious society or church, does so with implied consent to church government. Watson v. Jones, supra.

Similarly, if the Church is in fact congregational in nature, and therefore its government vested in the congregation, then the resolutions resulting from the overwhelming majority vote of the membership were determinative of the dispute.[4] There is simply no room in the

---

[3] If plaintiffs are seeking judicial review of the electoral process undertaken by the Church, such is beyond the jurisdiction of the civil courts which is strictly confined to temporal issues, civil or property rights. The involvement of the Court with issues purely in the nature of ecclesiastical government would be without regard to the constitutional line demarcating church and state. The First Amendment's interdiction against the involvement of the civil courts with underlying controversies over religious doctrine was noted by the Supreme Court in Serbian Eastern Orthodox Diocese v. Milivojevich, 426 U.S. 696, 710 (1976) as applying "with equal force to church disputes over church polity and church administration."

[4] Where there is a split in the nature of a "schism," the majority vote, in the congregational context, is not necessarily determinative with regard to disputes concerning title to property. The civil courts, applying neutral principles of law, have recurringly sustained the property claims made on behalf of the church by the membership adhering to the tenets of faith as hitherto practiced regardless of whether that

118

circumstances for this Court to be interfering with Church government let alone considering the dissolution of its charter at the instigation of a handful of discordant members.

Finally, plaintiffs also appear to intimate, with their claim that as members of the Church they each held a defined and vested proprietary interest in the Church's property, that therefore with their separation from the Church they were entitled to have separated out that proprietary interest. For example, from Mr. Funaki Ofa's point of view, he had been a founding member and in his many years with the Church he had personally contributed some $17,000. (In cross examination this total was explained as monies from personal income as well as from fund raising.) This money he wants back.

Quite apart from our difficulties in accepting the accuracy of Mr. Ofa's accounting, or that he even kept an accounting, he parted property interest with that money long ago, at least in accordance with the familiar principles applying to perfected gifts with no strings attached. There is no revocation after delivery of the property gifted and we find nothing on the evidence to show a contrary donative intention on the part of Mr. Ofa, or indeed on the part of any of the other contributing membership, that giving to the Church was otherwise than unconditional. (Certainly Mr. Ofa never had property to start with in the donations received by him from third parties on behalf of the Church.) For these reasons the claims of the other plaintiffs to interest in the Church's property are similarly seen as unfounded.

---

membership happens to be in the minority. It is not in the majority's power to take for themselves such property to support new and conflicting doctrines. The reasoning is that property dedicated by way of trust to a particular charitable purpose came within the civil court's duty to ensure that property so dedicated was not diverted from the trust which is thus attached to its use. This equitable doctrine as to charities was seen as equally applicable to ecclesiastical matters. Watson v. Jones, supra. As we noted at the outset, the matter before is not a case involving a schism.

We conclude on the foregoing that plaintiffs and each of them have failed to demonstrate any cause for relief. Therefore the complaint is hereby dismissed and plaintiffs take nothing thereby. Judgment accordingly.

It is so Ordered.

